UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Haywood S. Gilliam, Judge

| | | |
|---|---|---|
| FINJAN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. CV 14-2998-HSG** |
| | ) | |
| SYMANTEC CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| FINJAN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. CV 13-5808-HSG** |
| | ) | |
| PROOFPOINT, INC., ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Francisco, California
Thursday, July 9, 2015

<u>TRANSCRIPT OF PROCEEDINGS</u>

Reported By:      Pamela A. Batalo, CSR No. 3593, RMR FCRR
                 Official Reporter

Appearances Continued on the following page:

**APPEARANCES**:

For Plaintiff:

                KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP
                990 Marsh Road
                Menlo Park, CA  94025
      **BY:  PAUL J. ANDRE, ATTORNEY AT LAW**
          **JAMES R. HANNAH, ATTORNEY AT LAW**
          **AAKASH JARIWALA, ATTORNEY AT LAW**

For Defendant Symantec Corp.:

                QUINN, EMANUEL, URQUHART & SULLIVAN
                500 W. Madison Street - Suite 2450
                Chicago, IL  60661
      **BY:  KATE CASSIDY, ATTORNEY AT LAW**
          **ALEXANDE RUDIS, ATTORNEY AT LAW**
          **NATHAN HAMSTRA, ATTORNEY AT LAW**

For Defendant Proofpoint, Inc.:

                QUINN, EMANUEL, URQUHART & SULLIVAN
                50 California Street - 22nd Floor
                San Francisco, CA  94111
      **BY:  JENNIFER A. KASH, ATTORNEY AT LAW**
          **SAM S. STAKE, ATTORNEY AT LAW**

                QUINN, EMMANUEL, URQUHART & SULLIVAN
                555 Twin Dolphin Drive - 5th Floor
                Redwood Shores, CA  94065
      **BY:  BILL TRAC, ATTORNEY AT LAW**

1

2                      **P R O C E E D I N G S**

3                           **---OOO---**

4         **THE CLERK:**  We're calling C 14-2998, Finjan, Inc. vs.

5   Symantec Corp.

6       Please step forward and state your appearances for the

7   record, please.

8         **MR. HANNAH:**  Good afternoon, your Honor.  James Hannah

9   from Kramer Levin for Finjan.  Nice to see you.

10        **THE COURT:**  Good afternoon, Mr. Hannah.

11        **MS. CASSIDY:**  Good afternoon, your Honor.  Kate

12  Cassidy from Quinn Emmanuel on behalf of Symantec.

13        **THE COURT:**  Good afternoon, Ms. Cassidy.

14      All right.  So we are here for a hearing on a motion to

15  strike Finjan's infringement contentions.  All right.  So I'm

16  not a huge fan of this aspect of patent practice, to be honest

17  with you, but it's part of the job, part of the responsibility,

18  so here we are.

19      All right.  Here is my main question.  It does appear that

20  the claim charts that were submitted are duplicative.

21  Essentially that we've got the various products broken out, but

22  then they are described as infringing in exactly the same way.

23  Well, no, they're not described as infringing in the same way.

24  They have the same language, basically.

25      And if the global point here is to get to the point where

we can focus on the issue and understand what the infringing
aspect of the accused product is and how it maps to the claims
of the patent, how is the way that it is structured now
adequate.  In other words, if the language of each is going to
be the same, doesn't there also have to be some detailed
explanation of why it is that the various products all infringe
in the same way.  It seems to be presumed that they do because
the language is the same, but isn't it required under the local
rule for Finjan to explain why that is?

     **MR. HANNAH:**  So, your Honor, I think you're referring
to Exhibit A, which is an April 4 patent we can take, for
instance, which has Exhibits A1 through A8 addressing the
various patents and the different products.

     The reason that we separate it into eight charts that are
similar is because of a complaint by the defendants.  The
defendants came to Finjan and said that pursuant to this
Court's order, that we needed to break it up by products or by
product groups, and we told the defendants that we believed
that they infringed in the same manner because they used the
same anti-malware engine.  The anti-malware engine is the same
across all of these products.

     However, in order to compromise, we said we'll split it up
into different charts for you, into the different groupings so
that you have adequate notice and know what the infringing
products are.  That's why we split those up.

1    If you look through the charts, all of them do accuse the

2  anti-malware with respect to the April 4 patent.  All of them

3  do accuse the next generation anti-malware as infringing and

4  how it interacts with all these various Cloud aspects.  I

5  know -- the Cloud products and things like that.

6    What happens is a file will come into -- say we'll start

7  with the first one, the Norton consumer products.  A file will

8  come into it.  The next generation anti-malware engine will

9  start analyzing it.  If it doesn't know what that file is, it's

10  going to kick it out to the Cloud, to Symantec, to see exactly

11  what is going on.  If you're looking at the April 4 patent, as

12  your Honor probably remembers, that deals with generating the

13  downloadable security profile by an inspector and creating some

14  sort of link between them.

15    So once that is done, by that -- and then -- that analysis

16  is done in the Cloud once that anti-malware engine sends it to.

17  That's exactly how it works for the Norton products, the

18  end-point products.  Any product that has the anti-malware

19  engine utilizes the same technology.

20    **THE COURT:**  And is what you're just describing clear

21  on the face of the contentions?

22    **MR. HANNAH:**  I believe so.  If you look at the

23  headings in the contentions, if you look at where it

24  specifically says, we have -- what happens is we provide a --

25  wide infringes and then we provide evidence of how the

1    anti-malware engine is incorporated into those products.

2        So, for instance, I know one complaint was about the mail

3    security products. Well, if you look at the charts, it

4    identifies the anti-malware engine and how it inter-operates

5    with the Cloud and then it specifically -- then we cite a

6    document that says the mail product includes the anti-malware

7    engine and so we do that for all of the products in the product

8    groupings.

9        **THE COURT:** Is it your contention that the way that

10    the anti-malware engine operates in each accused product

11    infringes in the same way?

12        **MR. HANNAH:** For the April 4 patent as using this

13    example, absolutely, your Honor. I mean, because it's the same

14    engine that they populate across all their products. From the

15    public record, from a previous case which is also in the public

16    domain, we know that once they have a technology -- once

17    Symantec has the technology and they implement it to their

18    engine, they put that into all their products.

19        And so that's why we cite all of that information saying

20    that this engine is in these various technologies and products.

21    And the reason that we broke it up into the product groupings

22    themselves, into the eight, is because that's how Symantec

23    grouped it. Symantec, on its website, groups it just like we

24    set forth. That's also in the briefing.

25        I have a slide presentation that I can show you that you

that highlights all this stuff, but it's -- it's on their

website and that's how they actually grouped those products.

So we followed what Symantec is telling the public in terms of

the groupings.

    **THE COURT:**  But do you concede or agree that all of

the claim charts that you did for the '844 Patent are

substantively identical except for the name of the product, the

accused product?

    **MR. HANNAH:**  I think they are very, very similar, I

would say, because they infringe in the same way, yes.  There

are some differences in terms of what evidence was cited for

different products and things like that, but largely I would

say 90 percent, 95 percent are the exact same.

    **THE COURT:**  All right.  And so in this instance, we

could have just had a chart for all the products that says *they*

*infringed the same way and here's the way*.

    **MR. HANNAH:**  And that's what we gave them in the

beginning.  We gave them one chart that had that and they

complained.  They said that needs to be broken up into product

groupings.  And Finjan submits that this is just another way

that the defendants are stonewalling Finjan in discovery.

    We gave them these charts, we grouped them this way, we

put all of the groupings together.  They came back and said

*okay, now we want* -- *now we want separate charts for all the*

*groups*.  So then we did that.

1    Then they filed a motion without meet and conferring to

2 see if that was the issue.  We had no idea that this was the

3 issue, which was why we brought the motion for sanctions.  But

4 we gave that to them.

5    They've had notice.  We actually got a spreadsheet that

6 identified most of the accused products in terms of a financial

7 spreadsheet so they have notice of what the accused products

8 are.

9    So, again, Finjan submits that this -- the -- we have

10 provided adequate notice under the law in terms of what the

11 accusing products are.

12    **THE COURT:**  Is it your contention that the contentions

13 spell out why the anti-malware component of these different

14 products infringes in the same way across the products?  In

15 other words, it's one thing to say the anti-malware feature is

16 the issue.  It's another to explain why that is and why there

17 isn't -- why the way that the anti-malware component is used in

18 the actual accused products infringes.

19    **MR. HANNAH:**  If I follow your question, your Honor, I

20 believe so.  So what we did is we identified how the

21 anti-malware engine infringes.  Again, we are focused on the

22 '844, as an example, in these charts.

23    And then we provide evidence showing that the anti-malware

24 is in a particular group of products, and we did that for A1

25 through A8.

1    So, yes, we explained how it infringes and then we

2  explained why and the evidence supporting the fact that that

3  engine is in the grouping of products for that particular

4  chart.

5    Does that answer your question, your Honor?

6        **THE COURT:**  I think so.  Let me mull it.

7    All right.  Ms. Cassidy.

8        **MS. CASSIDY:**  Thank you, your Honor.

9    You may be surprised that I disagree with counsel's

10  representation that their charts were clear and that they did

11  provide the representative analysis that they were supposed to.

12    You are right, that if these products do, in fact, share

13  one common infringing engine, then we just needed one chart and

14  we just needed them to chart the anti-malware engine, but

15  that's not what they did.  They break it out into eight

16  different charts for the '844 Patent.

17    And not only did they not show how the products within

18  each chart share the same infringing functionality, they didn't

19  show you how each product that has been accused by the '844

20  Patent shares the infringing functionality.

21    And then if all we're looking for is the anti-malware

22  engine, then I don't understand why there is all this

23  additional detail about other engines in here that I'm not

24  to -- have anything to do with the anti-malware engine.

25    The whole idea of these infringement contentions are

1    supposed to be specific so the parties can streamline this

2    case.  If all they need is discovery on the anti-malware

3    engine, that is a very different proposition than having

4    discovery on 70-plus accused products that we're now facing and

5    growing.

6            THE COURT:  Do you agree that all we need to focus on

7    at this point is the anti-malware engine since that's the core

8    of the infringing dimension of every accused product?

9            MR. HANNAH:  I want to be very careful, your Honor.

10           THE COURT:  Of course.

11           MR. HANNAH:  We are talking about the '844 Patent, as

12   an example.  As you may remember, we have a web search patent,

13   which is different technology.  We have the very fun HTTP

14   Embedded Data patent with the management data, so that is

15   different technology.

16       So focus on the '844 patent.  And I would agree that we

17   need evidence on the anti-malware engine, but then we also

18   need -- I mean, discovery on the anti-malware engine.  There is

19   about five engines that we have detected so far that are being

20   used in the Cloud.  So, yes, we would need it on the

21   anti-malware engine and then we would also need it on the

22   Cloud.

23       If we wanted to specifically focus the discovery on that

24   so we can actually get something in terms of a deposition to

25   understand how these things are working, if you go to -- if you

1    go to page -- I mean, on Exhibit A, Page 9, we list the engines

2    that we specifically would like discovery on and how these

3    things interact.

4        We list here the next generation anti-malware engine and

5    then the Symantec Vantage MutantX, DMAS and BASH with Running

6    Water and then we list a variety of databases that those

7    interact with.  So if we could get discovery on those,  then I

8    agree.

9        One point to counsel's argument that we should have

10   grouped it, I find that very frustrating.

11       **THE COURT:**  Well, forget it.  I mean, I truly have no

12   patience for the quibbling and --

13       **MR. HANNAH:**  I understand.

14       **THE COURT:**  And both sides have plenty of quibbling to

15   claim here.

16       But, again, just getting back to this point, at first I

17   heard you say, at least with regard to the '844 Patent, that

18   the focus is the anti-malware engine.

19       **MR. HANNAH:**  Sure.

20       **THE COURT:**  And so then to Ms. Cassidy's point, why do

21   we then have all this other stuff about these other engines?

22   If it truly is the case that the infringing limitation is

23   contained in the anti-malware engine, why isn't that just

24   identified and why are we not just talking about that?

25       **MR. HANNAH:**  Because -- so, your Honor, there are two

1    components here.  Let's use the Norton consumer products as an

2    example.

3        The anti-malware engine exists on a computer and then it

4    receives the information, the downloadable that comes in.  When

5    it does its analysis, it doesn't really know what's going on

6    with that downloadable to see if it's malicious.  It kicks it

7    out to the Cloud.  And then the Cloud does its analysis.

8        So it's not just the anti-malware engine.  It's also the

9    analysis done in the Cloud.  So if we focus it -- we can take

10   these number of products and focus it down to the specific

11   engines that are talking about the anti-malware engine and the

12   components that the anti-malware engine interact with in the

13   Cloud, which is only like five more engines that we've

14   identified, then we would be happy to start the discovery

15   process there, and I don't think that we would have to go.

16       I further submit that if the defendants would sign a

17   stipulation saying that all of these products use the

18   anti-malware engine and that we can use this evidence across

19   the products, we would eliminate a whole host of discovery

20   because my concern is once we do say that the anti-malware

21   engine and we prove that the anti-malware engine with the Cloud

22   infringes, they're going to say -- they're going to come back

23   to us and say well, you didn't prove that it did it for each of

24   the 70 products and that's our concern.  So if they're willing

25   to stipulate with us that it's the same -- it's going to be the

1    same proof that we have to set forth and it would encompass all

2    those 70 products, then we can take that issue right off the

3    table.

4         **THE COURT:** Again, I'm not here to broker the

5    discovery. Do you have a discovery magistrate in this case?

6         **MS. CASSIDY:** Not yet, your Honor.

7         **THE COURT:** I'm going to refer it. All right.

8         **MS. CASSIDY:** A couple of points just real quick.

9         **THE COURT:** Sure.

10        **MS. CASSIDY:** I think this discussion exemplifies

11   exactly why there needs to be representative analysis that is

12   required under the case law because a lot of this discussion

13   that we are hearing here today is not fairly listed and not

14   disclosed in these charts. And all of this analysis about it's

15   just five engines, it's just one engine, depending on how you

16   ask the question, and it keeps changing, I think this is

17   exactly why we needed the representative charts.

18        If I just may also say, your Honor, with respect to our

19   point about not complying with Rule 3-1(b), counsel said that

20   they wanted discovery about the engines listed on page 9. BASH

21   9.0 with Running Water is not identified with respect to Rule

22   3-1(b), which is exactly our point.

23        Every time we turn around, there is just a new engine that

24   they accuse of infringing and they want discovery on it.

25   That's what we listed in -- why our Exhibit DD, which we

1    attached to our motion which lists all of the information that

2    is included in the chart but not specifically identified --

3    that's why we are asking for that to be stricken because the

4    rules are supposed to be able to crystalize the infringement

5    contention, however they want to do it.  If they want to do it

6    by representative charts, fine, but they didn't do that.  And

7    they didn't do it by going product by product either.  One way

8    or the other, we just want some -- some idea about what their

9    theories are so we can focus on those in discovery.

10           **THE COURT:**  That's what the rule contemplates.

11        **MR. HANNAH:**  Your Honor, in terms of -- again, we're

12   looking at Exhibit A, I'm looking at the '844 Patent for the

13   Norton consumer products, the fourth paragraph after we talk

14   about how the Norton products meet the recited claim language

15   specifically states, "Symantec Next Generation anti-malware

16   engine relies on cloud link scanners and detection engines, and

17   Symantec Clouds.  Symantec Cloud makes information about new

18   threats instantly available via the Symantec Cloud

19   infrastructure."

20        I don't know how they can argue that they didn't have

21   notice that it's the Symantec anti-malware engine interacting

22   with the Cloud.  It's exactly what is provided here.

23           **THE COURT:**  What is your response, Ms. Cassidy?

24        **MS. CASSIDY:**  So the idea of notice with respect to

25   the theories in general, the problem we have is that you can't

look at this one -- one buzz word, I'll say, in isolation. The claim language has some very specific language and it says receiving a downloadable and then you take the downloadable and you do something with it for the remaining parts of the claim.

That's the same with all of these patents, your Honor. So for the '844, what we're talking about here is not just saying there is a downloadable that is received in the Cloud. What their patent relates to is receiving by an inspector a downloadable and then generating a security profile for that downloadable and then you have to link it in the next elementation.

What we don't have here is a thread through their infringement contentions that connect all of these activities with respect to these downloadables with the -- with what they've identified here. So just looking at the Cloud link scanners in isolation, say, look the words appear, so give us discovery on it, that's not their infringement theory. Their infringement theory has to map to the claims.

**MR. HANNAH:** Your Honor, so now it sounds like they do have notice that it was the anti-malware engine and now she is moving on to an argument that okay, now we didn't map it to the specific claims, which we absolutely did. If you look at our opposition, we provided a ton of examples in terms of, for instance, what the downloadables are. We listed it in a chart form, we put it in our Exhibit 3 to our motion. We have gave

them exactly what that is, above and beyond what this district

requires in terms of disclosures and mapping it to particular

elements.

Then for Symantec to state that they don't know what the

downloadables are, they clearly didn't look at the charts and

the examples that we provided. We provided what the inspector

is, we identified what the origin content server is. We

identified all those, and it's specifically provided in our

briefs, underlined, highlighted. We actually attached Exhibit

3 which provides excruciating detail about what each of those

elements are.

So now that it seems like we have an admission that they

have notice of what our theories are, in terms of mapping it to

the elements, we clearly provided that and we provided a

replete of examples throughout our charts in order to

illustrate that.

I mean, the purpose here is to give them notice so they

know what to provide discovery on. I can -- for the '844

Patent, for instance, I can send them a letter in a week that

says give us discovery on these engines. And then we can move

forward.

MS. CASSIDY: Your Honor --

MR. HANNAH: I would love for that to happen.

MS. CASSIDY: Your Honor, that's interesting, and I

know that you're not inclined to hear discovery disputes, but

we asked exactly for that.  We had a meet and confer some weeks ago --

      **THE COURT:**  I actually will not hear the discovery dispute.  It's more than an inclination.

      **MS. CASSIDY:**  That's fine.

      **THE COURT:**  All right.  The other question I have in these case is whether -- obviously the Court has 200 other cases.  I don't live this the way that you all do.  I don't have time to go through hundreds of pages and try to match it up and see whether the detailed technical information provided matches up with the requirements of the rule, frankly.  To actually process the hundreds of pages at issue here is a huge burden on the Court and public resources, frankly.

And so I'm required to do that and we'll do what we have to do under the local rule, but one alternative approach or additional approach would be to say all right, look, you say it's there.  You say it's not there.  You'll be held to it.  If at the end of the day you show up with an expert saying something different, if you try to show up at the trial with somebody different and they can show that, why would an exclusion be warranted at that point.

In other words, the struggle with these is that they're supposed to mean something, they're supposed to streamline the case, they're supposed to get to the point.  From my experiences, that's not what happens.  It's an enormous amount

1  of paper generated without much efficiency benefit.

2  And given the reality of it, it seems to me that however I

3  decide this, if the plaintiff is saying that their contentions

4  are adequate and disclose the theory and later want to take a

5  different path, I think that's something that I would have to

6  look at with a very skeptical eye, and maybe the way these

7  things work out in practice is that's kind the hazard you're

8  running.  At the end of the day to spend a giant amount of time

9  batting these contentions back and forth strikes me as an

10  arguable utility.  But I also think that it's certainly, in the

11  software context, maybe all of this is an arguable utility.

12  All right.  Off the soap box.  Submitted.

13  **MS. CASSIDY:**  Thank you, your Honor.

14  **THE CLERK:**  We're calling C-13-5808, Finjan Inc. vs.

15  Proofpoint Inc., et al.  Please step forward and state your

16  appearances for the record, please.

17  **MR. ANDRE:**  Good afternoon, your Honor.  Paul Andre

18  for Finjan, Inc.

19  **THE COURT:**  Good afternoon, Mr. Andre.

20  **MR. ANDRE:**  Good to see you again.

21  **MS. KASH:**  Good afternoon, your Honor.  Jennifer Kash

22  from Quinn Emanuel for Proofpoint.  With me is Sam Stake and

23  Bill Trac, along with Michael Yang from Proofpoint.

24  **THE COURT:**  All right, Ms. Kash.

25  All right.  A similar issue.  Although here it seems to me

there are a couple of framing points.  One is that it really

seems to me that this dispute has two tiers.  One is whether at

this point, what Proofpoint refers to as pinpoint source code

sites are required, and I looked at the cases that were cited

for that prospect, and I don't know that they're crystal clear

as to that.  I can see policy and efficiency arguments that

could cut both ways on that.

So that's tier one, whether source code is required at

this point or whether that's something that is properly

reserved to the expert report stage.

Then second is setting that aside, whether in other

respects, the disclosures are adequate.  Even if source code is

not required, is what's been done sufficient to meet the

requirements of the rules.

So those are the two issues really for me.  The third

issue that I really want to impress on both parties is this is

another one where there is this underlay of well, we didn't get

discovery and we don't have what we need so we can't do it

because they're not playing fair on discovery.  And that part

of it, I have no patience for.  If there is a discovery issue

that is important to moving the case forward, then tee it up

yesterday.  Judge Lloyd is ready and willing and able and has

been very active in the case, and it's just not going to cut it

to have that be something that is presented to me on a

substantive motion as a justification for my ruling one way or

1    the other.  So I want to make that very clear to the parties.

2        And meeting and conferring and trying to work it out is

3    one thing, but I'm not seeing that happening here, and so to

4    say seven months later that now on the substantive motion

5    before the district judge there is a discovery issue that's

6    causing a problem, it's not something I have any intention of

7    hearing, frankly.  Anything that needs to get teed up and

8    resolved, do that before Judge Lloyd and get it handled because

9    I think that is bleeding into the substantive proceeding in a

10   way that I don't have any patience for.

11       **MR. ANDRE:**  Fair enough, your Honor.  I think that's

12   advice we'll heed to and go forward with Judge Lloyd on that

13   front.  It wasn't meant to be an excuse of any kind.  It was, I

14   guess, a mitigating circumstance regarding source code, but

15   nothing about the rest of the discovery.  We will take that up

16   with Judge Lloyd.

17       With respect to the issues you raised with regard to

18   pinpoint citations of source code, you could imagine what this

19   is going to look like if that is required by the courts in

20   Northern California.

21       First of all, no court has ever required it.  We cite

22   cases from Judge Alsup, Judge Tigar, even Judge Grewal who we

23   have a Finjan case going to trial a week from Monday.  He

24   hasn't required that type of pinpoint citation.  And you could

25   imagine because usually the infringement contentions come early

in the case before you even get much discovery at all.  You

would be getting constant motions for leave to amend if

pinpoint citations are required because you don't get pinpoint

citations until the very end of discovery, if you get them at

all, and those are usually in the form of expert report.

So in this particular case, we took your Honor's order

back in April in which you required us to do four things.  You

required us to create separate charts for each product, which

we did, five charts, five products.  We made separate charts

for each one of them.

You said provide charts that address each element, which

we did.  You said describe the infringement theories with

adequate specificity to meet Patent Local Rule 3.1.  We went

through chapter and verse.  We put all the technical documents

in.  We put in API calls, flow charts for every single element.

We described it in a narrative form.  We gave the evidence to

support it, even though the evidence is not required.  And you

said delete the references to Dr. Medvidovic's unwillfull

infringement and we did.

So in each one of those instance, we did exactly what the

Court's order required, and Proofpoint hasn't complained about

that.  They haven't lodged a complaint about -- when you look

at the motion and you look at the headings of their motion,

their arguments, it's all about pinpoint citations.  It's one

issue that is really involved in this case and does the law

require pinpoint citations to source code, and there is nothing
to support that proposition.

     The rule itself doesn't state it.  The law that has been
in this district for the past 10-plus years, the *Renesas* case
basically says you don't have to provide evidence.  This is
about notice of theories of infringement.  Not only do they
want evidence, which we did supply, they want pinpoint
citations of source code.  That is above and beyond.

     Now, if we get to the stage of expert reports, we are
either going to have pinpoint citations or not.  And if we have
them, then, you know, they're fair game, we can go forth at
trial.  If we don't have them, we won't.  But that's where the
citations of source code really come into play in all patent
cases.

     This is a new standard that Proofpoint is trying to put
into this district and they can't find a single case that will
support that.  The case, the *Big Baboon* case down in the
Central District involving contention interrogatories responses
is not for this proposition for patent local rule, preliminary
infringement contention.  The emphasis is on preliminary
infringement contentions.

          **THE COURT:**  Right.  Although on that point, I did read
*Big Baboon* and the *Vasudevan* the same way, but coming back to
some of the themes that you heard me talking about in the last
case, whatever the form, at some point don't we have to get to

1   the point where it's clear to everyone what the infringing

2   aspect of the product is, and I mean are you saying that in Big

3   Baboon and Vasudavon it was later?

4       I don't know that the fact that it's interrogatory

5   response versus infringement contention matters that much to

6   me.  I know there is a dispute about the interrogatory

7   responses, too.  So the point is in whatever form it comes,

8   when do we appropriately get to the point where we've narrowed

9   this down and really identified what the core issue is because

10  that's what we're trying to do.

11      **MR. ANDRE:**  Your Honor, we have already.  We have

12  actually identified -- we went through each product.  I

13  personally supervised this because we had a motion to strike

14  that was granted against us and that is the first time that has

15  ever happened to us.  And looking at the previous disclosures,

16  I understand your Honor's rationale for the grouping issues at

17  this time.  So I personally made sure we went through each one

18  of those five accused products.  We went through technical

19  documents.  We describe in extreme detail the flow charts, API

20  calls, and we actually gave source code directories.  Now, the

21  source code directories, that was not easy to do.  We spend 60

22  hours looking through source code to actually get that much.

23      So we actually gave the directories, where it is located,

24  based on their interrogatory responses, based on the deposition

25  they took, the one deposition they gave us.  We provided all

that information.  There is nothing that is going to surprise

them here.  The only thing they're trying to do is trying to

make us take a position on source code that we would have no

way of knowing.  It would be a best-guess scenario because we

haven't had -- and we're getting to that.  Our experts are

looking at it.  We haven't had a chance to get to that level of

detail because of our discovery disputes, and Judge Lloyd will

be hearing from us in the next week.  I can almost promise

that.  Those things are teed up.

But the fact of the matter is for preliminary infringement

contentions, this is just not the standard.  And we have a

Finjan trial that is going to trial a week from Monday with

Judge Freeman.  This case was originally with Judge Freeman

previously.

In that case, the defendant actually moved the Court and

said, you know, their infringement theories don't match up to

the preliminary infringement contentions.  They didn't give us

adequate notice.  This was a month before trial.  And she

killed our infringement theories.  She said, "You're right.

You had the information you and didn't give it to them."

In this case, it's source code.  It's something different.

If they look at our infringement contentions of these products,

and they say, "Oh, well, you didn't name the right engine, and

you should have.  Once you had found out you had the wrong

engine, you should come to the court and made a motion."

1   That's what Judge Freeman says.  She says, "Listen, Mr. Andre

2   you had an obligation, because we said, "Well, this particular

3   engine is located in this bigger file."  She says, "Well, you

4   should have come to me then and asked for permission to add

5   that in," and she excluded it at trial.  That is exactly what

6   she did.  And we lost one of our infringement theories a month

7   before trial because we didn't disclose it.

8       Now, we will take the infringement contentions we've put

9   forward in this case and live with them, and if we get through

10  discovery and we find out we're wrong or something or we need

11  to add something, we will come back to your Honor and ask for

12  leave to amend or Judge Lloyd or whoever you want us to go

13  through.

14      But that's how this is supposed to work.  It's not

15  supposed to be a moment of *gotcha* because they say, *oh, you*

16  *have to identify a very specific course code module* which we

17  have no way of knowing until we get much, much later in

18  discovery and much more discovery.

19      That's our point here.  We'll live with our infringement

20  contentions as they are now.  We did everything your Honor

21  asked for in the previous order.  We separated them out.  We

22  gave them notice.  They know exactly what product is infringing

23  and how it's infringing.  The only thing they don't have and

24  the only thing they complain about is we haven't identified

25  line items on the source code.  We've even identified the

modules -- I mean, the directories of the source code, which

was, like I said, no small task.

**THE COURT:** Ms. Kash.

**MS. KASH:** If I could address that.

I think that there is a little bit of fundamental

miscommunication and perhaps regarding what we mean when we say

pinpoint citations.

And what I mean by that is we were before you in our

arguments with respect to the motion to strike in the first

instance on the grounds that they didn't provide the evidence

to show how the products practice, each of the elements that is

required by the local rule.

And your Honor might recall -- and this is at page 4 of

your -- of the transcript from then -- that time, is that they

stated to -- specifically to this Court -- they said that they

didn't have access to the source code. This counsel for

Finjan. Any of their technical information. And a lot of

these patents really go to -- they're directed to what specific

rules, routines, source codes, elements that may be occurring

at the back end, and we can identify the functionality as they

disclose it and particularly given the nature of this industry,

this is security software, they're not going to be publishing

their specific rules and make those available because hackers

would be able to bypass any of the rules that are provided out

there publicly.

1    And so what we have to do is utilize all the public

2    information that we can, and then once we have a chance to

3    really get into all the other technical information, we can

4    provide more.

5    And then it says the case law is pretty clear when it

6    comes to software and source code in particular, the nature of

7    these type of patents that are involved here and the technology

8    involved here point -- and it points to the *Network Caching*

9    *Technology Case vs. Novell*.  They said if you can't identify

10   the specific routines a lot of times, you're going to need the

11   source code and analyze it to provide it.  And the Court

12   acknowledged that they didn't have the source code.

13   And then they went on to argue that there were discovery

14   disputes and they said that they needed to have -- see the

15   source code and they needed to get it and to provide the

16   specificity.

17   They didn't do anything.  They did not once come to check

18   our source code until after they filed their infringement

19   contentions, the new ones after the the Court's order.  And we

20   have the same problem that exists.  It's not about the pinpoint

21   citations particularly.  It's about the fact that they haven't

22   identified the elements of how we infringe with any evidence at

23   all.

24   And we've identified on page 9 -- 8, 9 and 10 of our

25   brief -- we've identified those elements where what they're

1    essentially doing by pointing to directories is saying, *Look*

2    *looking at that 30-, 40-story building.*  *Your infringing*

3    *instrumentality is somewhere on one of those floors in one of*

4    *those offices, in one of those drawers.*  *We may decide later to*

5    *tell you where.*  And that is not the way that -- the case law

6    that they cite even, *Oracel vs. Google*, in this district

7    specifically states that it's not a requirement, and I agree

8    with that.  At the outset, it's not a requirement to have a

9    precise pinpoint citation.  If you cite to a document and you

10   say -- and you explain your theory by evidence of the defendant

11   and you say here is where it is, okay, that's fine.  We move

12   on.

13        But when you're going to point to source code and say that

14   it's necessary to demonstrate infringement and then you point

15   to the big building and you say, *Later on we'll tell you where*

16   *it is*, that is not an adequate disclosure, and that's where the

17   cases say that pinpoint citations are necessary at a later

18   stage, and there has been cases in this jurisdiction that we

19   cite, *Sun Microsystems* as well, that says that when you're

20   looking at source code in that situation, you have had access

21   to it for over a year.  You can't rely on the fact that you

22   can't get to specific information in that situation.

23            **THE COURT:**  Let's be clear.  Do you agree that there

24   is not a case that has said that specific citation to source

25   code in the infringement contention is required?

1    **MS. KASH:**  I think that there is not a specific case

2  that says that in the absence of any other -- if -- there is

3  not a case that says if you're going -- let me rephrase.  Let

4  me see how I can explain this in a way that makes sense.

5    There is not any case that says you have to, if that's

6  your only -- if you have other documentary evidence and you are

7  also pointing to source code, it is not the case that

8  potentially if you are relying on it you would have to rely on

9  a specific pin cite.  But you can't support your only basis for

10  evidence regarding proving the elements of infringing of a

11  claim, your notice and your theory of infringement, by pointing

12  to pieces of evidence that you have and you point to general

13  source code directories, this big sort of big umbrella.  There

14  is -- they are trying to say -- they are saying it must be in

15  there as opposed to providing citations.

16    And that's where the case law is clear, in my view, in the

17  cases *Oracle vs. Google*, *Big Baboon*, and the cases that follow

18  it, *Adobe*, *Sun Microsystems* -- all those cases are talking

19  about the fact that there are -- when you are going to be using

20  source code and you have access to it, that's where -- when you

21  are relying on that to show how you infringe, that's where the

22  pinpoints are necessary.  I'm not saying in all instances they

23  are.

24    **THE COURT:**  All right.  So a couple questions.  One is

25  I read, at least, Finjan's argument to be -- and they make this

at page 10 -- 10 and 11 of their brief and then the charts --

that it isn't just the source code.  That they -- they have

disclosed the car engine, engine V5, as an example, using the

evidence functionality.  And this is just one example.  And

argue, in essence, that they have pinpointed the functionality

at issue, and, in essence, the source code is a bonus.  That

these source code directories are something extra they try to

do and maybe they're willing to give them to you, maybe they're

not.  But I think their position would be that even if they

hadn't given you the source code directories at all, they would

have complied with the rule.

MS. KASH:  Well, I think that -- the example -- if --

this is why we did not move to strike their contentions in

their entirety, your Honor.  The issue here is more specific

and nature.

The issue here is that where they have -- where their

theory of infringement resides only -- is reliant on the

reference and pointing to source code and they just provide

these high level directories and they have had it for over a

year, that is the specific situation I'm speaking to.

So the issue -- and Mr. Andre just tried to articulate

it -- was he said *we intend to provide information later on as*

*to how you have source code that infringes in our expert*

*reports*, and the case law is saying if you have access -- if

they provided a pinpoint citation in one instance or where they

are pointing to something being in the code -- like, for

example on -- on the -- in the actual -- the contentions -- I

believe it's for the term -- 9D of -- which patent is this?

So in Appendix B-1 for the '822 patent, they point to --

for the elements of showing code, they state, "Based on

Finjan's limited review" -- this is on page 14 of the

defendant's source code -- "Finjan has determined that the

source code located at the following directories and

subdirectories support infringement of this element."  And

that's specifically for an element that requires the use of

code.

They said at the hearing to the Court, *We need code to*

*demonstrate infringement*.  And so the issue here isn't one of

necessarily being the case.  I'm not saying that if you have

evidence and they're saying *we're willing to just live by what*

*we state in our documents as being the proof of infringement*,

then that's fine.

They're not saying that.  They're saying *in order for us*

*to show you how you infringed, we have to point you to code*,

and then they don't point us to code.  They point us to the

big, huge building without any specificity.

And that's the fundamental issue that we have here.  It's

not a discovery issue.  It's an issue of disclosure.  And the

Court at -- set forth very -- in -- in my opinion, a very

reasoned order stating that there wasn't a tie-in to the

element-by-element basis to evidence that they were showing, and what they did is they didn't -- they said to you *well, we need to look at the code, we haven't had that long to review the code*. There is two or three pages where they argued that in the hearing and then they don't do that. They do nothing more than what they had at the time of the hearing in terms of disclosure.

And where the elements require code to be able to show and demonstrate infringement, they have to provide that evidence; otherwise, it's as though they provided nothing.

**THE COURT:** All right. Understanding that every case is special, is this case any different than the many, many software cases that have stated the more general rule? In other words, I would gather that it's almost always going to boil down to source code at some point, but the question is when and the question is whether evidentiary support is required at the contention stage as opposed to notice.

Essentially it sounds like you're arguing for a rule that in some cases the only adequate notice is actual evidentiary disclosure, but I think you would agree that would be a new rule. I haven't seen any court apply that rule.

**MS. KASH:** They have to identify where the infringement is in the accused products. And so the issue here goes back to -- I think maybe because we're going granular is that -- the point here -- this is when we were here originally

the first time. Trust me -- these are the kind of arguments that are -- I don't want to be making. I would rather move forward and argue substantively on this case. The issue here is that what are the accused products and how do they infringe. That's what they have to tell us.

If they are saying the accused products and how they infringe, how they infringe is in this big, huge building, you go find it, that's not adequate disclosure. And we were here before the Court -- it's a different situation -- that's the cases that we cite in our brief. *Sun Microsystems* in page 8 of our brief. It's also the *Shared Memory Graphics vs. Apple* case. That was in 2010.

Under existing case law, the patentee must map specifically elements of defendant's alleged infringing products on the plaintiff's claim construction at that time, and the plaintiffs bear the burden of providing infringement contentions that specify the location of every claim element within the accused products. They bear the burden -- and that case is the -- that's the *Sun Microsystems* case quoting *Shared Memory Graphics, LC vs. Apple*, *Inc*, 812 F.Supp.2d 1025. And it's also the *Bender vs. Maximum Integrated Products* case, which is a Westlaw cite, 2010 WL 1135762 at 2.

The issue there is where -- it's not the case that -- it is the case that in those circumstances where it's the case that the mapping and identification of how a product infringes,

where that is the fundamental issue, requires a citation to source code, you, at that point, have to cite specific source code.  That's the issue.

So oftentimes you're in a situation where maybe that isn't necessary.  Maybe you have a case that is, like, top level where it's very -- it's a generic business method patent.  I have no idea.  There's all sorts of issues like that.  Or you have a case where it's hardware.  Or maybe it's something that is very clear from the face of the way it works and operates in practice when you use it.

But here, as they stated, you're dealing with back-end technology, which is what they told you.  They said, if you might recall -- at the last hearing, they said, *We can't tell from public availability how it infringes.  We can't tell*.  So we gave them the source code in June of 2014, and they are supposed to go into it and go look at it and say, *here is how you infringe*.

If they do that and they map it to one line of code, one element of code that discloses the element of our products that infringe, then we wouldn't be here today.  Then later, if they have other elements in the code that they want to argue infringe in the same manner, like you said to my colleagues earlier, that's an issue that we will deal with later at trial.

But my client is entitled to know how the accused products infringe and what accused products do that, and they are

telling us it's in the code and then they want to say it's in the code over there in the 50-story building and you go find it because we don't have time to do it in the year that we've had. And that is not adequate disclosure under the law. And that's our position.

MR. ANDRE: Well, okay. If she wants to go with there with it, okay.

MS. KASH: I do.

MR. ANDRE: Your Honor, the fact of the matter is there are so many misstatements here I don't know where to begin.

The fact of the matter is even the case she cites, the *Network Cashing Technology* case from 2003 states that Patent Local Rule 3.1 does not require NCT to produce evidence of infringement. You don't have to provide ironclad evidence of infringement at this stage of the proceedings.

In every one of our charts, we have identified the product that infringes, the element and how it infringes, and then we have given their confidential documents, all this other technical information we provided in that notice.

The would say well, the only -- her statement, which is completely illogical, is the only way we could prove infringement is by code.

No, that's not the only way we can prove it. That's an additional way we will prove it to -- some of these elements.

Maybe not all.  The fact of the matter is when you have a jury sitting there and you show them source code, they kind of glaze over.  They don't know what source code looks like.  It is backup support.

We won't prove infringement with their confidential documents, with their testimony, with their engineers.  And in our charts, we've gone through and we've taken their public documents, we've taken confidential documents.  We have taken their APIs.  We have taken flow charts.  We've put all that in here.  We have given them the notice they require.

Now, when we get more information about their code, will that go into expert reports, of course it will.  It always does in these type of cases.  If you were to require pinpoint citations as counsel suggests in the preliminary infringement contentions, this Court would be inundated with multiple, multiple motions for leave to amend infringement contentions; as the case goes on, on a monthly basis, as discovery rolled in.  That's not the point here.  We're supposed to say what's infringing.

Now, in the previous motion, your Honor said, *You lumped too many things together.  You grouped them too tightly.  You didn't separate them out.*  We said, *Fair enough.  That's a good point.  We did that.*

We also cited to the evidence and we described how those products infringe each and every element.  We'll live with

those.  I've got no problem living with that.  Now, do we get

to subsequent evidence that comes in.  For example, we -- you

read -- we won't talk to you about -- but we're having a hard

time getting depositions.  Well, our expert is going to rely on

that deposition testimony in his expert report.  They always

do, because that is additional evidence of infringement and

they are entitled to do so.

Source code will be additional evidence of that

infringement as well.  Right now we have given them the

high-level directories because that's what's available to us.

Once we get more information -- we can come back in here -- in

six weeks we will have expert reports.  Expert reports are

coming out six weeks from today.  And so we're digging deep

right now to get that information from them and we will go to

Judge Lloyd to get that, because, as I say, we have our issues.

But the fact of the matter is the disclosures we provided

give them notice.  It gives them a lot of information.  The

only thing it doesn't give them is each line item in a code

base -- that's primed for 10 million lines in which they have

stalled on us.  You know, they said since we've had it since

June.  We haven't had it since June.  Trust me.

The fact of the matter is that is not required by the

Patent Local Rules.  No court has ever said that.  In fact, I

could give you chapter and verse where a court has said it's

not required.  Most courts have said you don't have to give

1   evidence.  Just the infringement theory.  Identify the product

2   and how it infringes each element.  We did that.

3       **THE COURT:**  Assuming your position is that

4   Ms. Kobialka's  statement at the hearing about back end and

5   code is not fairly read as a concession, that puts this case in

6   a different posture than comparable cases.

7       **MR. ANDRE:**  It doesn't change anything, your Honor.

8   Ms. Kobialka was talking about the back-end stuff, the

9   confidential information, which we have some of that now.  We

10  actually got some of their documents.  We cited those

11  documents.

12      Some of this information, back-end information is

13  required.  We have -- in our infringement contentions, you have

14  to use, at the very least, your Rule 11 basis and before we

15  file these lawsuits, we do extensive analysis of the products.

16  We do what we can based on the public information.  Any kind

17  of -- if you are lucky enough to be able to obtain the product,

18  we test it, we do all that type of stuff.  And that goes into

19  our infringement contentions in the public base.

20      Now, once we get the confidential information, like we did

21  in this particular case because we have amended these

22  contentions later on in the case, we added that in here.  But

23  in a normal sense, I believe the infringement contentions are

24  due, I think, 30 days after the CMC.  And many times discovery

25  is just beginning.  You won't have these confidential

1   documents, and it's based on all public information.

2       Ms. Kobialka was talking about we can give more details

3   when get that confidential information because a lot of

4   functionality is on the back end.  You don't need the code

5   level -- that's not the only evidence of infringement.  There

6   is other evidence of infringement:  The public information, the

7   confidential documents, the APIs, which we were able to pull

8   now, the flow charts, that type of information, and that's all

9   inclusive in these charts.

10          THE COURT:  All right.

11          MS. KASH:  Just briefly addressing that, your Honor,

12  without getting into the discovery disputes or the statements

13  that were made by Mr. Andre, the issue here has -- is, again,

14  as I've stated -- is not so much the pinpoint citations and the

15  case law that exists with it.  It's identifying the elements in

16  the accused products.

17          THE COURT:  Are you saying the only way that can be

18  done is by citation to the source code?

19          MS. KASH:  No, I'm not saying that.  I'm saying that

20  that's the way they've done it for many of these elements to

21  these claims, is by citing just to these big directories.  If

22  Mr. Andre is willing to say -- this is one of the bases for

23  relief we ask.  If he is willing to say that he is not going to

24  rely on source code for demonstrating his theories of

25  infringement that are -- other than -- so if there is a

technical document and he uses that to show how a product operates, then he should be limited to that. He can't change how our accused product operates based on some codes later by pointing to the fact that he says, *Oh, but we referred to this huge top-level directory*. *You should have known*. That's a limited issue. We are not seeking to strike all the contentions. They have to be struck with -- if they are going to rely on the big-picture directory for relying on that to show how a product infringes, they should be limited to that. If they're going to be relying on something on the code to demonstrate the theory of infringement by using the code showing that's how this elements reads on this claim, then that's where they should provide a pinpoint. They can't have it both ways.

If they want to have no code right now because we're not going to rely on code, we're going to point to documents and engineers, as he said, then we're fine. Okay? Then I guess this is how they're saying that our products infringes. We will take up with experts on summary judgment.

But if they're going to say and point to the fact that they're going to say *you knew our theory because we pointed to this huge top-level directory when you had access to our code for a year* and that's their basis for giving their disclosure of their theory of infringement, which, frankly, is not sufficient and not disclosed and we understood Ms. Kobialka to

1    be saying specifically that, that you need to look at the code

2    and we need that to be able to answer the Court's questions on

3    that, then they can't later fix that.

4        And that's the specific issue.  I don't disagree that

5    there's plenty of cases where you don't have pinpoint citation

6    code.  That's absolutely the case.  Mr. Andre and I, together

7    we have tried a case where source code was an issue, and Judge

8    Sleet in Delaware had some issues with respect to the

9    disclosures of code, but at the same time, the infringement

10   contentions in that case weren't required to have pinpoint

11   citations based on other factors.  I'm not saying that's the

12   case.

13       But we're here.  The Court has already looked the these

14   contentions, and we're almost a year and a half, almost two

15   years into the litigation, and they have had access to this

16   information, and obviously we take a different position.  We

17   think they have had all of it for a long time.  We are not

18   talking about Rule 11 here.  We're saying where are they

19   disclosing the accused instrumentality.  The elements of the

20   claims are mapped to the accused instrumentality.  If they are

21   saying they don't need code for that, if that is what they are

22   willing to stick to, then okay, that's fine.  But they can't

23   simply just state the elements are found here of all these

24   claims.

25            **MR. ANDRE:**  Your Honor, we are not saying that.  We

1  are not saying we don't need code.  We're also not saying we

2  don't need additional discovery.  We need testimony from their

3  engineers.  We haven't gotten that yet either.  We also need

4  more confidential documents, which will augment these

5  infringement contentions.

6      We don't have to prove our case in preliminary

7  infringement contentions.  The case law is chapter and verse on

8  that.  You don't have to prove your case.  You don't have to

9  provide all your evidence, exhaustiveness of all your evidence.

10  We just have to give notice.  We've done so.

11      Now, more evidence is going to come in and we expect to

12  use that to prove our case when the time appropriate.

13      **THE COURT:**  I think I understand the parties'

14  positions on this.  I will take it under submission and issue a

15  ruling.

16      **MR. ANDRE:**  Thank you, your Honor.

17      **MS. KASH:**  Thank you, your Honor.

18      **THE COURT:**  You're welcome.

19          (Proceedings adjourned at 3:43 p.m.)

20

21

22

23

24

25

1

2

3                    <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Tuesday, July 21, 2015

8

9    *Pamela A. Batalo*

10   _____
     Pamela A. Batalo, CSR No. 3593, RMR, FCRR
11   U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25